IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| JULIETTE CLIFTON, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 3:10-0330 |
| ) | Judge Trauger |
| TENNESSEE PROFESSIONAL ASSISTANCE ) | |
| PROGRAM and CENTENNIAL MEDICAL ) | |
| CENTER, ) | |
| ) | |
| Defendants. ) | |
| ) | |

# MEMORANDUM

Pending before the court are the defendant Centennial Medical Center's Motion to Dismiss and Motion to Dismiss Second Amended Complaint, which seek identical relief on identical grounds (Docket Nos. 7 and 13). For the reasons discussed herein, these motions will be denied.

## FACTUAL AND PROCEDURAL BACKGROUND

The plaintiff, Juliette Clifton, is a registered nurse who was employed by the defendant Centennial Medical Center ("Centennial") from July 2008 through May 2009.[1] The plaintiff alleges that, in February 2009, she was under tremendous stress due to family problems.

---

[1]Unless otherwise noted, the facts are drawn from the plaintiff's Second Amended Complaint (Docket No. 5.) As can be seen herein, a comprehensive exploration of each of the plaintiff's specific allegations against Centennial is not necessary for purposes of evaluating Centennial's grounds for dismissal, and, therefore, the court provides a somewhat abbreviated overview of the Complaint allegations.

1

Specifically, the plaintiff's husband had suffered serious medical problems that rendered him unable to work, and the plaintiff had become responsible for taking care of him, raising their five children, and performing her stressful job. In light of this, the plaintiff was taking prescription medicine to deal with, among other things, migraine headaches. The plaintiff's stressful circumstances and medications were well known to her managers at Centennial. The plaintiff's migraine medication caused occasional dizziness, and, during the early part of her morning shift on February 24, 2009, the plaintiff claims that she made a passing remark to a co-worker that she "just got a little dizzy" coming around the corner of a hallway. (Docket No. 5 at 3.)

The plaintiff alleges that this one, forgettable, remark precipitated a series of events that ultimately resulted in her termination from Centennial. That is, an unspecified employee reported to the plaintiff's manager that was she was "dizzy or drunk" at work, the manager ordered that the plaintiff undergo an immediate drug screen, the drug screen was conducted under embarrassing circumstances in a public bathroom, and then the plaintiff was sent home to await the results. The plaintiff alleges that the drug screen was negative, but Centennial still ordered her, as a condition of continued employment, to "self report" to the Tennessee Professional Assistance Program (TnPAP) because, no matter the results of the screen, she had still been "dizzy" and "erratic" in the work place.

In March 2009, once enrolled with TnPAP, the plaintiff underwent a required psychological examination, at her expense. While, during the examination, the plaintiff showed no signs of substance abuse, the plaintiff's psychologist, Dr. Benjamin Fite, reported the results as "inconclusive" and recommended "monitoring" for the plaintiff. TnPAP, for reasons

unknown to the plaintiff, then enrolled the plaintiff in substance abuse "monitoring." The plaintiff alleges that Fite's initial recommendation was driven by a false report from Centennial that the drug screen was positive. Upon learning that the drug screen was negative, Fite "completely revised" his assessment but still recommended monitoring by TnPAP, apparently due to the plaintiff's stress. (Docket No. 5 at 6.) This revision, however, delayed preparation of the "Monitoring Agreement" that the plaintiff was required to sign with TnPAP.

"Monitoring" by TnPAP required that, among other things, the plaintiff call in to TnPAP every day and submit to an average of 15 drug screens per year, at the plaintiff's expense. Additionally, the plaintiff could not apply for nursing positions without disclosing her participation in the TnPAP program and providing prospective employers with a copy of the Monitoring Agreement, which, the plaintiff claims, makes it appear as if the plaintiff had a drug problem and was in "recovery." In an effort to avoid signing the Monitoring Agreement, the plaintiff attempted to "explain the events from her perspective" to TnPAP representatives, and she also obtained numerous letters from various treating physicians and social workers indicating that there was no evidence that the plaintiff had a drug problem. These letters are attached to the Second Amended Complaint. (Docket No. 5 Ex. A.)

The plaintiff claims that none of her efforts was effective in persuading either Centennial or TnPAP. On May 5, 2009, the plaintiff received the revised Monitoring Agreement and, by the next day, all parties understood that the plaintiff would sign the Monitoring Agreement. Still, Centennial stated that it would not hold the plaintiff's job open beyond May 8, 2009 unless she signed the Agreement. On May 7, 2009, the plaintiff signed the Agreement, and, on May 11,

3

2009, she was terminated by Centennial for failure to comply with the rules of TnPAP. The plaintiff also alleges that TnPAP has since cancelled the Monitoring Agreement and issued a report concerning the plaintiff to the relevant investigatory body within the Tennessee Department of Health (TDOH).

The plaintiff filed her EEOC Charge, alleging discrimination by Centennial under the Americans with Disabilities Act (ADA), on May 11, 2009. (Docket No. 7 Ex. 6.) After not being paid by Centennial since February 25, 2009, the plaintiff applied for unemployment compensation in May 2009, and Centennial challenged her claim, stating that she had been terminated for "workplace misconduct." Centennial's challenges ultimately did not prevent the plaintiff from receiving approval for unemployment compensation. Ultimately, however, the plaintiff and her family lost their home.

On November 24, 2009, the plaintiff filed her "Verified Complaint for Extraordinary Relief" in the Circuit Court for Davidson County, Tennessee, seeking a temporary restraining order prohibiting TnPAP (the lone defendant sued under this Complaint) from enforcing the Monitoring Agreement or reporting the plaintiff to the TDOH. (Docket No. 1 Ex. B at 8.) On December 9, 2009, the plaintiff filed a state court Amended Complaint that, again, only sought injunctive relief against TnPAP. (*Id.* at 42-43.) After the plaintiff's attempts to obtain injunctive relief proved unsuccessful, on February 12, 2010, the plaintiff filed another Amended Complaint that added Centennial as a defendant and asserted claims against both defendants for breach of contract, intentional infliction of emotional distress, defamation (TnPAP only), negligence, negligent infliction of emotional distress, and violations of the ADA and the Tennessee

4

Disability Act (Centennial only). (Docket No. 1 Ex. C. at 10-16.) In this Amended Complaint, the plaintiff estimated her damages (not including punitive damages) at $1,000,000. (*Id.* at 17.)

On March 31, 2010, the defendants removed the case to this court, and the plaintiff filed her Second Amended Complaint (asserting the same claims) on April 6, 2010. (Docket No. 1, 5.) Centennial filed the pending Motions to Dismiss on April 15, 2010 and April 22, 2010, with the second Motion directed at the Second Amended Complaint. (Docket No. 7 and 13.)

Centennial's argument is entirely based upon the plaintiff's previous bankruptcy court filings and related arguments of judicial estoppel and standing. Attached to its motion, Centennial provides documentary support that the plaintiff filed a Chapter 13 Bankruptcy Petition in the United States Bankruptcy Court for the Southern District of Mississippi on February 29, 2008.[2] (Docket No. 7 Ex. 1.) The Chapter 13 proceeding was dismissed by the Bankruptcy Court on June 16, 2009, largely because the plaintiff failed to file a required response to objections to the proposed payment plan. (Docket No. 7 Ex. 9.) The Trustee's "Final Report and Account" (issued in February 2010) indicates that the plaintiff did not receive a discharge of any of her unsecured debt through the Chapter 13 action. (Docket No. 7 Ex. 10.)

On June 30, 2009, the plaintiff filed a Chapter 7 Petition in United States Bankruptcy Court in this District. (Docket No. 7 Ex. 2.) The Bankruptcy Court initially discharged the plaintiff on October 27, 2009, apparently due to lack of non-exempt assets. (Docket No. 7 Ex. 13.) On March 16, 2010, however, a Notice was sent by the Clerk of the Bankruptcy Court that

---

[2]To be clear, the bankruptcy filings discussed herein involved the plaintiff and her spouse.

5

stated that (unspecified) assets of the estate had been recovered, and any creditor had until June 14, 2010 to file proof of a claim against the estate if the creditor "wish[ed] to share in any distribution of funds." (Docket No. 7 Ex. 14.) On March 23, 2010, the Trustee filed an Application to Employ Attorney, which sought permission from the Bankruptcy Court to employ the plaintiff's attorney (Nanette Gould) to pursue the claims against TnPAP and Centennial on behalf of the estate. (Docket No. 7 Ex. 12.) This motion was granted by the Bankruptcy Court on April 16, 2010. (Docket No. 14 Ex. 3.)

It is undisputed that both the Chapter 13 and Chapter 7 petitions have at least two places (that is, "Schedule B" and the "Statement of Financial Affairs") for the debtor to indicate that one of his assets is a legal claim against an entity. And it is also undisputed that, despite providing considerable detail about her assets, nowhere on either the Chapter 13 or Chapter 7 petition did the plaintiff mention her claims here, and the plaintiff never updated either petition to reflect her claims. This is despite the fact that the plaintiff filed her EEOC Charge about seven weeks prior to filing her Chapter 7 petition.

The plaintiff claims that she discussed whether to list her EEOC Charge as an asset on her Chapter 7 petition with her bankruptcy counsel, and she was "advised that filing an EEOC charge alone was not considered an asset under bankruptcy law." (Docket No. 14 at 2.) The plaintiff claims that she subsequently learned that she needed to disclose the EEOC Charge (and presumably this litigation) and immediately initiated the process of disclosing that information. (*Id.*) In support of this, the plaintiff submits a February 19, 2010 letter from plaintiff's counsel to plaintiff's bankruptcy counsel in the Chapter 7 action asking him to "immediately file an

amended Schedule B with the bankruptcy court," in light of the fact that "no potential assets" from the plaintiff's claim against the defendants here were listed on her Chapter 7 petition. (Docket No. 14 Ex. 1.) There is no indication from the record that an amended petition has been filed.

**ANALYSIS**

Defendant Centennial seeks dismissal of the plaintiff's case on the grounds of judicial estoppel and standing. The plaintiff responds that the equitable rationales behind the judicial estoppel doctrine do not justify dismissal here and, because this case is now being pursued by the Trustee and not the plaintiff, the defendant's standing argument is without merit.

**I.      Judicial Estoppel**

   **A.      Legal Standard**

The judicial estoppel doctrine "generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase." *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) (internal quotation omitted). The Sixth Circuit has explained that judicial estoppel "preserve[s] the integrity of the courts by preventing a party from abusing the judicial process through cynical gamesmanship." *Browning v. Levy*, 283 F.3d 761, 776 (6th Cir. 2002) (internal quotation omitted).

Although noting that "the circumstances under which judicial estoppel may appropriately be invoked are probably not reducible to any general formulation of principle," the Supreme Court has identified the following considerations for determining whether to apply judicial estoppel: (1) "a party's later position must be clearly inconsistent with its earlier position"; (2)

"whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled;" and (3) "whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." *New Hampshire*, 532 U.S. at 750-51 (internal quotations omitted). The Supreme Court warned, however, that these factors are not "inflexible prerequisites or an exhaustive formula for determining the applicability of judicial estoppel." *Id*. at 751.

In light of these considerations identified by the Supreme Court, the Sixth Circuit has held that "[t]he doctrine of judicial estoppel bars a party from (1) asserting a position that is contrary to one that the party has asserted under oath in a prior proceeding, where (2) the prior court adopted the contrary position either as a preliminary matter or as part of a final disposition." *Browning*, 283 F.3d at 775 (internal quotation omitted).

As indicated above, the Bankruptcy Code requires debtors to file, among other things, "a schedule of assets and liabilities, a schedule of current income and current expenditures, and a statement of the debtor's financial affairs." 11 U.S.C. § 521(a)(1). This "duty of disclosure is a continuing one, and a debtor is required to disclose all potential causes of action" to the bankruptcy court. *Bohanan v. Bridgestone/Firestone North American Tire, LLC*, 2007 WL 1091209 at *3 (M.D. Tenn. April 10, 2007)(Wiseman, J) (internal quotation omitted). The disclosure obligations "are at the very core of the bankruptcy process and meeting these obligations is part of the price debtors pay for receiving the bankruptcy discharge." *Id*.

8

The Sixth Circuit has found that judicial estoppel should be applied to bar causes of action that were not disclosed to the bankruptcy court. *See Lewis v. Weyerhaeuser Co.*, 141 Fed. Appx. 420, 425 (6th Cir. 2005) ("This court has previously found that pursuing a cause of action that was not disclosed as an asset in a previous bankruptcy filing creates an inconsistency sufficient to support judicial estoppel.") However, the Sixth Circuit has also held that, even where the above considerations would otherwise dictate that judicial estoppel should apply, its application is "inappropriate when [the] omissions are the result of mere mistakes or inadvertent conduct." *Eubanks v. CBSK Fin. Group*, 385 F.3d 894, 898 (6th Cir. 2004). Mistakes and inadvertence have been found where the debtor "lacks the knowledge of the *factual basis* of the undisclosed claim or where the debtor has no motive for concealment." *Id*. (emphasis added).

On the motive issue, in most cases, the debtor has a motive to conceal and minimize the assets listed on the petition to reduce the potential pool for creditors. *See Lewis*, 141 Fed. Appx. at 426. Nevertheless, courts have held that a motive to conceal does not exist in two situations: (1) where the debtor has made significant efforts to notify the trustee or other parties about the lawsuit, but, for some valid reason, has not corrected his or her asset schedule, and (2) where the debtor is, for whatever reason, paying 100 percent of his or her debt. *See Eubanks*, 385 F.3d at 898-99; *Browning*, 283 F.3d at 776 ("[The debtor] will thus receive no windfall as a result of its failure to disclose its claims, because only [its] creditors will receive the distribution of any recovery.")

B. **Application**

As an initial matter, the court views the omission of the EEOC Charge (and this

9

litigation) from the Chapter 7 petition as far more relevant to the judicial estoppel analysis than the omission of the Charge from the Chapter 13 petition. As discussed above, the Chapter 13 petition was filed well before the plaintiff even began working at Centennial, and it was dismissed on June 16, 2009, about a month after the EEOC Charge was filed, with no relief from unsecured debt. While the plaintiff should have promptly disclosed the EEOC Charge in the Chapter 13 proceeding, given that (1) the case was dismissed so shortly after filing that Charge and (2) the plaintiff received "no windfall" in terms of relief from her creditors through the Chapter 13 proceeding, the court fails to see how it would serve the ends of justice to prohibit the plaintiff from pursuing this litigation because of her mild shortcomings as to her dismissed Chapter 13 petition. Therefore, the court will focus on the issues surrounding the Chapter 7 petition.

The plaintiff does not dispute that she should have disclosed her EEOC Charge on her Chapter 7 petition and should have updated her petition to reflect her claims in this case; however, the plaintiff claims that her omissions should be excused based upon mistake and inadvertence.[3] (Docket No. 14 at 2.) Centennial argues that the plaintiff should not be excused on inadvertence grounds because (1) she knew of the claim at the time she filed the Chapter 7 petition and (2) she had considerable reason to hide the claim because – at $1,000,000 in alleged value – the claim here is by far the biggest asset the plaintiff owns. (Docket No. 8 at 12.) The defendant contrasts this case with *Eubanks,* where the Sixth Circuit did not invoke judicial

---

[3]For the proposition that initiation of the administrative process with the EEOC demonstrates awareness of a claim that should be disclosed on a bankruptcy petition *see Paris v. Sansom*, 2007 WL 1345368, *7 (E.D. Tenn. May 7, 2007).

10

estoppel, as the plaintiff had made "constant affirmative" efforts to inform the trustee and the bankruptcy court of her claim; that is, even if the plaintiff directed her counsel in February 2010 to begin the process of updating the relevant materials, that does not excuse ten months of omission. (*Id.* at 12-13.)

In response, the plaintiff claims that her omissions are excusable and that her efforts to correct the problem have been significant. Again, the plaintiff contends that her bankruptcy counsel advised her against listing the EEOC Charge as an asset on the Chapter 7 petition, and, once she learned of the unsound nature of this advice, which was about one month *prior* to the filing of Centennial's motion here, she had her counsel contact her bankruptcy counsel to put the "wheels in motion" for getting the relevant materials updated. (Docket No. 14 at 2-3.) Because of her actions, the plaintiff claims that "no unfair advantage exists for the Plaintiff and neither has Centennial suffered an unfair detriment." (*Id.* at 3.) In further support of her "good faith" argument, the plaintiff notes that it was not until February 2010 – when the plaintiff was working to correct the omissions – that her Complaint was amended to reflect claims of monetary value. (*Id.* at 4.)

In its reply, Centennial objects to the fact that the plaintiff's bankruptcy schedules still have not been updated and that creditors have not clearly been notified of the litigation, only that the estate has assets. (Docket No. 18 at 1-5.) Quoting *Lewis*, Centennial also argues that inaccurate advice of legal counsel is not a "panacea" for judicial estoppel problems. (*Id*. quoting *Lewis*, 141 Fed. Appx. at 427). Also, Centennial notes that there is no clear evidence that the plaintiff alerted the bankruptcy Trustee of the suit, as the record only clearly indicates that

11

plaintiff's current counsel wrote a letter to plaintiff's former bankruptcy counsel. (Docket No. 18 at 5.) This argument overlooks the fact that the Trustee has filed a motion, since granted, to retain plaintiff's counsel to represent the estate in this litigation, which is pretty clear evidence that the Trustee was alerted to the claims in this case, and the plaintiff or her counsel is certainly the natural person to have alerted the Trustee.

The court will decline to bar the plaintiff's claims on the ground of judicial estoppel.[4] As discussed in *Eubanks* and *Browning*, invocation of judicial estoppel is inappropriate where the debtor has made significant efforts to advise the relevant parties of the lawsuit and/or where the debtor will receive "no windfall" from the omission because "creditors will receive the distribution of any recovery." *Eubanks*, 385 F.3d at 898; *Browning*, 283 F.3d at 776. Here, both of these bases operate to counsel against the invocation of judicial estoppel.

First, on the significant efforts, as discussed in detail above, the evidence suggests that the plaintiff inquired into whether the EEOC Charge should be disclosed and was told by her counsel that it did not need to be. Once the plaintiff learned that this was false, she took corrective actions, generating a letter from her counsel in this case requesting that her

---

[4]Centennial also notes two other cases in which judicial estoppel has been imposed to bar a plaintiff's claims. *See Hardwick v. Cinram Distribution, LLC*, 2008 WL 217707, *8 (M.D. Tenn. Jan. 24, 2008)(Trauger, J); *White v. Wyndham Vacation Ownership, Inc.*, 2009 WL 1074800, *7 (E.D. Tenn. April 21, 2009). A basic review of these cases reveals clear distinctions that justified the imposition of judicial estoppel, particularly regarding the plaintiff's conduct. Additionally, by its very nature, analysis of a judicial estoppel argument is entirely dependent on applying the basic, well-settled law to the unique facts and circumstances of the individual case. Therefore, to argue that this court or another court invoked judicial estoppel in one case and, therefore, should invoke it here overlooks the point that the "totality of the circumstances" in those other cases was obviously different.

bankruptcy counsel "immediately" update the schedules. (Docket No. 14 Ex. 1.) While the schedules may not have been formally updated yet, the plaintiff can "only do so much" and it strikes the court as unsound for the viability of the plaintiff's claims against Centennial (which have absolutely no connection to the plaintiff's bankruptcy) to rise and fall on the speed with which plaintiff's former bankruptcy counsel submits amended documents to the Bankruptcy Court. Moreover, notice of the plaintiff's claims in this case has clearly reached the Bankruptcy Court in that, as noted above, the Trustee has received permission to retain the plaintiff's counsel to prosecute these claims. (Docket No. 14 Ex. 3.) All indications are that the plaintiff and her counsel have aggressively attempted to correct an earlier error, and, under settled law, this strongly counsels against the invocation of judicial estoppel.

Moreover, there is no indication that the plaintiff will receive any benefit from the omission or that the defendant has been prejudiced in any way. As discussed above, on March 16, 2010, just one week before the Trustee moved to retain the plaintiff's counsel, the Clerk of the Bankruptcy Court sent a notice to the plaintiff's creditors stating that assets of the estate had been identified by the Trustee and creditors should submit claims to the pool of assets. (Docket No. 14 Ex. 4.) While the specific assets are not identified, the timing of the notice suggests that the assets are related to this lawsuit, and, either way, the notice instructs creditors to file proof of a claim to the estate. (*Id.*) This will presumably allow the plaintiff's creditors access to the pool of funds, if any, that are awarded to the plaintiff's estate upon the conclusion of this litigation. Centennial has thus failed to show that the plaintiff will receive any benefit from her omission, and this also strongly counsels against the invocation of judicial estoppel here.

In sum, recalling that judicial estoppel is a "flexible" doctrine, the fundamental purpose of which is to "preserve the integrity of the courts by preventing a party from abusing the judicial process through cynical gamesmanship," the court finds no basis to invoke judicial estoppel here. At bottom, the record reveals that the plaintiff received some improper legal advice about whether to disclose her EEOC Charge on her Chapter 7 petition, and, once she learned that that advice was incorrect, she moved to make the required changes and notifications, many of which have already occurred, indicating that the plaintiff will receive no benefit from her mistake. This aspect of Centennial's motion will be denied.

## II. Standing

Combined, the parties have dedicated just four paragraphs of their briefing to the issue of standing. (Docket No. 8 at 13-14; Docket No. 14 at 5; Docket No. 18 at 8.) Centennial correctly argues that, at the commencement of the bankruptcy case, "all legal or equitable interests of the debtor" become the property of the estate, and, therefore, this action must be pursued by the Trustee of the estate, not the debtor, who lacks standing. (Docket No. 8 at 13 citing, among others, 11 U.S.C. § 541(a)(1); *Bauer v. Commerce Union Bank*, 859 F.2d 438, 441 (6th Cir. 1988); *Dutka v. Rosenthal*, 1997 WL 225510, *2-3 (6th Cir. May 1, 1997); *Davis v. Ford Motor Co.*, 1992 WL 322377,*3 (6th Cir. Nov. 5, 1992)).

In response, the plaintiff contends that, because the Trustee has retained counsel and the notice of assets has been sent to creditors, the Trustee "is now correctly and appropriately substituted as the plaintiff in the case at bar, with Attorney Gould [plaintiff's counsel] acting as attorney for the estate; nothing further is required of Plaintiff." (Docket No. 14 at 5.) In its

reply, Centennial claims that the plaintiff's response on the issue is "no[t] persuasive" and re-asserts that the claims should be dismissed. (Docket No. 18 at 8.)

*Bauer* appears to be the leading Sixth Circuit case on the issue. There, shortly after their Chapter 7 case was closed, the plaintiffs filed an "outrageous conduct" action in their own name. 859 F.2d at 439. After the defendant moved for summary judgment on the issue of standing, the district court "ordered that [the Trustee] either join, authorize, or abandon" the action. *Id.* at 440; *see also Clarke v. United Parcel Serv. Inc.*, 421 B.R. 436, 442-444 (W.D. Tenn. 2010)(re-affirming the basic proposition that a case cannot proceed in the district court unless the Trustee either "joins, authorizes, or abandons" the litigation initiated by the Chapter 7 debtor).

The *Bauer* Trustee requested that he be substituted for the plaintiff, and the district court granted that request and entered an Order deeming the Trustee as the sole plaintiff. 859 F.2d at 440. The Sixth Circuit concluded that such orders of substitution are governed by Federal Rule of Civil Procedure 25(c), which governs the substitution of parties where there has been a "transfer of interest," and the court concluded that such orders are left to the district court's discretion. *Id.* at 441. Reviewing the district court's conduct, the Sixth Circuit concluded that it was unable to "detect so much as a hint of any abuse of discretion here." *Id.* at 442.

In light of *Bauer* and the fact that all indications are that the Trustee has assumed responsibility for pursuing this litigation, dismissal of the action for lack of standing is inappropriate. *See Knight v. New Farmers National Bank*, 1991 WL 207056, *2 (6th Cir. Oct 15, 1991)(finding that the district court acted improperly in dismissing the debtor's claims without affording the debtor an opportunity "to seek ratification by, or substitution of, the

bankruptcy trustee").[5]  That said, in light of the facts of the case, the need for clarity, and the court's considerable discretion, the court will order that Ms. Gould file a Notice of Substitution that identifies for the court and the defendants the name of the individual who now pursues these claims and that provides an updated caption for this case.

## CONCLUSION

For the reasons discussed herein, Centennial's Motion to Dismiss and Motion to Dismiss Second Amended Complaint will be denied.  Ms. Gould will be ordered to submit a Notice of Substitution identifying the name of the plaintiff and clarifying the caption in this case within 15 days of the date of the accompanying Order.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge

---

[5] Also Fed R. Civ. P. 17(a)(3) states that "[t]he court may not dismiss an action for failure to prosecute in the name of the real party in interest until, after an objection, a reasonable time has been allowed for the real party in interest to ratify, join, or be substituted into the action. After ratification, joinder, or substitution, the action proceeds as if it had been originally commenced by the real party in interest.")