# IN THE UNITED STATES DISTRICT COURT FOR THE
# MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

| | |
|---|---|
| BANKRUPTCY ESTATE OF KEVIN J. AND JULIETTE CLIFTON, ) ) ) Plaintiff, ) ) v. ) ) TENNESSEE PROFESSIONAL ASSISTANCE ) PROGRAM and CENTENNIAL MEDICAL ) CENTER, ) ) Defendants. ) ) | Case No. 3:10-0330 Judge Trauger |

## MEMORANDUM

The plaintiff, Juliette Clifton[1] (Docket No. 46), and both defendants, the Tennessee Professional Assistance Program (TPAP) (Docket No. 39) and Centennial Medical Center ("Centennial") (Docket No. 40), have each filed a Motion for Summary Judgment, and these motions have been fully briefed. (*See* Docket Nos. 47-50, 54-55, 57.) Additionally, TPAP has filed a Motion to Strike (Docket No. 59). For the reasons discussed herein, the court will dismiss the plaintiff's lone federal claim and remand all remaining causes of action to the Davidson County Circuit Court.

## FACTUAL AND PROCEDURAL BACKGROUND

Clifton is a registered nurse with 17 years of experience, who was employed by

---

[1] On May 19, 2010, the Bankruptcy Estate of Kevin J. and Juliette Clifton was, at the court's order, substituted for Juliette Clifton, who originally brought this suit. (Docket No. 21.) For convenience purposes, the court will refer to Juliette Clifton as the plaintiff.

1

Centennial in Nashville, Tennessee from July 2008 through May 2009.[2] When Clifton started at Centennial, she was assigned to the "High Risk Obstetrics (HROB)" unit. Patients in the HROB unit have very complicated pregnancies, and the pressures to deliver quick, high quality care can resemble that of an emergency room. Until the events giving rise to this case, the plaintiff was regarded as a good nurse who took good care of her patients, and she received favorable employment reviews. The plaintiff had a stressful home life – she was the sole provider for five children, her husband is totally and permanently disabled, and the family lost their home in Hurricane Katrina, which precipitated their move to Nashville.

The relevant events in this case began on February 24, 2009. At that time, the plaintiff was suffering from an upper respiratory infection and migraine headaches and was receiving out-patient treatment for those conditions. Centennial was aware of the plaintiff's illness and of the additional stress in her life. On February 24, the plaintiff, not feeling well, called in prior to her shift and asked to be taken off the schedule. While this was not possible, the plaintiff was

---

[2]Unless otherwise noted, the facts are drawn from the parties' statements of material facts (Docket Nos. 47 Ex. 1, Docket No. 48 Ex. 1, Docket No. 49 Ex. 1, Docket No. 51) and related affidavits and exhibits. Although facts are drawn from submissions made by both parties, on a motion for summary judgment, all inferences are drawn in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S 574, 586 (1986); *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). Compiling the factual background from the parties' responses to the statements of material fact in this case was more challenging than usual because the interests of TPAP and Centennial are not necessarily aligned and because of the parties' sometimes obstinate approach to responding to the statements of fact, which included picky citation objections and hearsay objections that seemed to ignore clear exceptions and exclusions to the hearsay rule. Statements of material fact are designed to assist the court, not make the court's task more difficult. The court has culled through the entire record and attempted to convey the factual background in the most accurate and complete way, consistent with the Rule 56 standard.

assigned to another unit, Labor and Delivery, for that day.

Once at work on the 24th, the plaintiff spoke to Jenny Harmon, her assistant manager, about some of her personal difficulties, and Harmon set up a meeting for the plaintiff with an Employee Assistance Program (EAP) counselor at Centennial. The plaintiff met with the EAP counselor later that morning, and the two discussed family issues. The EAP counselor also determined that there was no need to test the plaintiff for substance abuse. The plaintiff left early on the 24th because she continued to not feel well. When she got home, the plaintiff took Fioricet, a medication that she had been prescribed, to help with her migraines.

The next day, February 25, the plaintiff returned to the HROB unit and was assigned six postpartum patients, which is somewhat unusual, as the plaintiff's patients were generally "antepartum," that is, women with significant pregnancy complications who require hospitalization for monitoring prior to delivery. Postpartum patients have just delivered babies and often require more regular and frequent assistance from nurses.

Therefore, the plaintiff maintains, her shift on the morning of the 25th was unusually busy, as she attempted to meet the needs of her six patients. Early in the shift, as she briskly came around a corner, the plaintiff said, "whew, I just got a little dizzy," but, the plaintiff maintains, she recovered quickly and attributed the spell to the Fioricet, which sometimes caused her a slight sense of vertigo. Otherwise, the plaintiff claims that her shift on the 25th was relatively uneventful until "sometime between 10:00 and 11:00 a.m., [when she] was summoned to the office of Freda Gardner," her manager, where Gardner and Harmon were waiting for her. (Docket No. 47 Ex. 1 at 3.)

3

Other nurses on the plaintiff's floor that morning had a different view of the plaintiff's behavior. For instance, Diane Dowden, a nurse with 28 years of experience, testified that the plaintiff was "very distracted or like in a fog" and her patients "were constantly calling out, wanting things." (Docket No. 37 Ex. 9 at 13-14.) Dowden testified that the plaintiff stared blankly at her when Dowden tried to tell her something about a patient and that other nurses noticed the plaintiff's difficulties, "were talking back and forth about it," and "they thought she was on something." (*Id*. at 13-15, 25.) After viewing this conduct for a little while and hearing other nurses discussing it, Dowden reported her concerns to Harmon. (*Id*. at 14-15.)

Mary Katherine Lombardi also noticed that the plaintiff was "acting strange" during her shift on the 25th. (Docket No. 37 Ex. 4 at 22.) She testified that patients' linens are normally changed one room at a time, but, on the morning of the 25th, the plaintiff had collected a stack of linens for various rooms and was pushing all of the linens for the various rooms down the hall on an overflowing wheelchair. (*Id*. at 22-23.) Lombardi also informed Harmon that she was concerned about the plaintiff and that she needed to be watched. (*Id*.)

Harmon testified that, after receiving reports of the plaintiff's "disorganized" and "confused" behavior (including the wheelchair incident) from a few nurses, she decided to observe the plaintiff and she also noticed that the plaintiff was changing linens in an odd way, especially as the clean linens would often fall out of the wheelchair onto the heavily trafficked floor of the hallway.[3] (Docket No. 37 Ex. 2 at 19-26.) After briefly attempting to address the

---

[3]During Harmon's deposition, plaintiff's counsel suggested that the plaintiff may have had a shoulder injury at this time, suggesting a rationale for this method of "passing" linens. (Docket No. 37 Ex. 2 at 27.)

4

linens issue with the plaintiff, Harmon went to Gardner and informed her that "several" nurses had been concerned about the plaintiff and, from her own observations, the plaintiff was acting strangely. (*Id*. at 27.) At this point, Gardner called for the plaintiff to come to her office to meet with her and Harmon.

Harmon testified that, during the meeting in Gardner's office, the plaintiff "appeared very [] confused and not on [] top of her game." (*Id*. at 46.) Harmon recalled that she asked the plaintiff for her patient "report sheets," and, when the plaintiff went to pull the sheets from her pocket, "there was stuff going everywhere. There was pills – she had a whole entire pocket full of different medicines, and her report sheets and paperclips and tissues, and it was just a big mess." (*Id*.) Harmon maintains that the plaintiff, contrary to protocol, had pulled the medicines (including narcotics) for all of her patients at once and was planning on distributing them but could not clearly explain who had already received their medicine and who had not. (*Id*. at 46-48.) According to Harmon, at this point, it was very clear that the plaintiff did not "have it together." (*Id*. at 49.)

Gardner testified that, during the meeting, the plaintiff conceded that she had felt "loopy" earlier in her shift but was now feeling better. (Docket No. 37 Ex. 6 at 17.) Gardner recalled that the plaintiff appeared "confused" and "emotional," unable to stay on a single subject, and "very sort of discombobulated." (*Id*. at 18.) Gardner also testified that the plaintiff began pulling medicines and assorted paperwork out of her pockets and that it "was really difficult to follow where she was with her patients and who had been medicated and hadn't been medicated." (*Id*. at 22.) Gardner and Harmon determined that the plaintiff should not continue

5

to work with patients that day.

Additionally, Gardner contacted JoAnn Ettien, the administrator for the Women's Hospital at Centennial, who came down to the meeting. (*Id.* at 20-24.) Ettien submitted a declaration in which she stated that, during the meeting, the plaintiff appeared "disoriented and disconnected." (Docket No. 44 at 1.) As Ettien, Gardner, and Harmon believed that a drug test was appropriate, they contacted Human Resources manager Tina Butner. In her declaration, Butner maintains that, when she came to the meeting, she also observed that the plaintiff was "confused, sluggish, and tearful." (Docket No. 43 at 1.) All parties agreed that Clifton should not return to work and should be drug tested. After a standard drug test was administered, the plaintiff's husband arrived to drive her home.

The plaintiff's drug test was negative. However, given their concerns about the plaintiff's behavior and patient safety, the plaintiff's managers and Centennial human resources managers still believed that the plaintiff should be referred to TPAP, which is a third-party professional employee assistance program that Centennial uses to determine if an employee – for whatever reason – is safe to return to work. Patricia Knight, who was a human resources vice president for Centennial at the time, testified that, shortly after the drug test results came back, she recommended to Clifton that she "self-report" to TPAP, because of the "behavioral" and "patient charting" issues that had revealed themselves on February 25th. (Docket No. 37 Ex. 3 at 19-20.)

Knight testified that it was Centennial's expectation that Clifton would follow this advice to report to TPAP, that she would "comply with [TPAP's] recommendations," and, thereafter,

6

TPAP would inform Centennial when the plaintiff was fit to return to work. (*Id.*) There is little indication from the record that the plaintiff could reasonably expect to return to work at Centennial or avoid further investigation unless she self-reported to TPAP for evaluation.

On March 12, 2009, the plaintiff "self-reported" to TPAP. After reporting, the plaintiff was assigned a case worker (Marcia Bradley) and was referred for an evaluation by Dr. Benjamin Fite, a psychologist in the TPAP "network." Fite's role was to evaluate the plaintiff and provide TPAP with a recommendation as to whether and how TPAP should monitor the plaintiff.

In conjunction with Fite's meeting with the plaintiff, Gardner provided Fite with information about the plaintiff. Fite testified at his deposition that Gardner had told him that, on the 25th, the plaintiff had raised the alarm of several nurses, appeared "hung over and groggy," had a pocket full of undistributed medicine in her pockets, and had reportedly told other nurses on the shift that she felt "drunk" and had almost been in a couple of a car accidents on her way to work. (Docket No. 37 Ex. 1 at 23-24.) Additionally, Fite testified that Gardner had said that some patient narcotics had been briefly missing and were discovered in the chair that the plaintiff had been sitting in during the meeting on February 25th. (*Id.*) The plaintiff thus claims that Fite was given an exaggerated picture of the plaintiff's condition by Gardner and the false impression that the plaintiff had a drug problem. (Docket No. 51 at 12-13.) Indeed, for reasons that remain somewhat unclear, Fite initially noted that the result of the plaintiff's drug screen had been positive. (Docket No. 37 Ex. 1 at 50.)

Fite initially saw the plaintiff on March 19, 2009. The plaintiff paid $400 to take the

7

initial personality test offered by Fite, and then, on March 30, 2009, she paid another $50 to take the test again, as the initial results were inconclusive. After reviewing the personality tests and interviewing the plaintiff, Fite diagnosed the plaintiff with "adjustment disorder non-specified," which was, in Fite's opinion, "the mildest diagnosis I could have possibly given." (Docket No. 51 at 14.) On April 14, 2009, at TPAP's direction, the plaintiff also went to see a social worker named Brian Silverthorne, for TPAP mandated counseling "related to her stress and anxiety." (*Id*. at 15.) There is no suggestion from the record that either Fite or Silverthorne believed that the plaintiff suffered from any chemical dependency or any severe mental problems, and there is every indication that both believed that a prompt return to work was in the plaintiff's best interest, as she was the sole provider for her family.

Still, Fite testified that, following his visits with the plaintiff, he recommended that TPAP enter into a "Monitoring Agreement" with the plaintiff, which would require that the plaintiff maintain regular contact with TPAP and submit to drug screens, at her own expense. Fite testified that he made this recommendation in light of (1) the detailed observations of Gardner concerning the plaintiff's workplace conduct on February 25th, (2) "trauma" in the plaintiff's background, (3) some evidence that the plaintiff had obsessive-compulsive tendencies, and (4) indications that the plaintiff was using pain medication as a coping mechanism. (Docket No. 37 Ex. 1 at 33-35.)

Following Fite's recommendation, TPAP and the plaintiff attempted to work together on a Monitoring Agreement. Given that, under the rules of participation in TPAP, the plaintiff had to disclose the Monitoring Agreement to potential employers, the plaintiff was very concerned

8

that the Monitoring Agreement not create the impression that she had a substance abuse problem. Also, the plaintiff wanted to continue taking certain prescription drugs, which TPAP would only "sign off" on if the plaintiff saw an addictionologist. Bradley testified that the plaintiff was reluctant to see an addictionologist and this delayed the signing of the Monitoring Agreement. (Docket No. 37 Ex. 7 at 45.) Indeed, Bradley generally testified that the plaintiff was reluctant to move the process along as TPAP directed, and, therefore, finalizing the Monitoring Argeement took considerably longer than expected. (*Id.*)

On April 28, 2009, with no Monitoring Agreement in place, Clifton received a letter from Centennial. The letter explained that Clifton could not return to work until she could show compliance with the TPAP program's recommendations and that she needed to show proof of that compliance by May 8, 2009, or she would be terminated. On May 5, 2009, the plaintiff received a revised draft Monitoring Agreement from TPAP, which made certain changes that the plaintiff had requested and was based on Dr. Fite's complete evaluation.

On May 6, 2009, Knight spoke to a representative at TPAP to check on the plaintiff's progress. Knight was informed that the plaintiff had indicated that she would sign the Monitoring Agreement. Knight informed TPAP that Centennial would not hold the plaintiff's job past May 8, 2009. On May 7, 2009, the plaintiff signed the Monitoring Agreement and delivered a copy to Centennial.

Still, Centennial elected to terminate the plaintiff's employment effective May 11, 2009. Knight testified that the issue was not whether the plaintiff had signed the Monitoring Agreement but whether, by May 8, 2009, TPAP could recommend that the plaintiff could safely

9

return to work. (Docket No. 37 Ex. 3 at 25.) In conversations with TPAP (either Bradley or TPAP Director John Harkreader) just before the plaintiff's termination, Knight gathered that TPAP could not make that recommendation because the plaintiff had not actually been monitored. (*Id*. at 25-28.) Indeed, Bradley and Harkreader testified that they could not have stated that the plaintiff was compliant with the TPAP program because the plaintiff had only signed the Monitoring Agreement and had not taken key steps such as registering for the drug screen program or "addressing medications that she was on and taking." (Docket No. 37 Ex. 7 at 72-73; Docket No. 39 Ex. 5 at 81.) Knight testified that, by May 8, 2009, the plaintiff had no leave time remaining, and "we simply saw no forward progress" on long-term compliance with the mandates of the TPAP program, and, therefore, the plaintiff was terminated. (Docket No. 37 Ex. 3 at 25-28.)

Despite losing her job, the plaintiff remained in the TPAP program. The plaintiff maintains that, while under the Monitoring Agreement, it was difficult for her to find employment. The plaintiff testified that she suspected that at least two hospitals were disinclined to hire her once they learned that she was under monitoring. (Docket No. 38 Ex. 2 at 128-130.)

In December 2009, the plaintiff initiated state court proceedings in Davidson County Circuit Court against TPAP, seeking injunctive relief that would allow her to terminate the Monitoring Agreement under certain terms. In February 2010, while these proceedings were ongoing, TPAP decided to end the Monitoring Agreement in light of the failed relationship with

the plaintiff. The plaintiff found another nursing position "very quickly" thereafter.[4] (Docket No. 49 Ex. 1 at 6.)

In March 2010, the plaintiff amended her state court Complaint to add Centennial as a defendant and to assert additional claims, including a claim under the Americans with Disability Act (ADA) against Centennial. (Docket No. 1 Ex. 3 at 6-16.) Citing the ADA claim as the basis for federal jurisdiction, the defendants removed this case to this court on March 31, 2010. (Docket No. 1.) On April 6, 2010, the plaintiff filed her Second Amended Complaint, which re-asserts state law claims for breach of contract, intentional infliction of emotional distress, defamation, negligence, negligent infliction of emotional distress, violations of the Tennessee Disability Act, and violations of the ADA. (Docket No. 5 at 10-16.)

## ANALYSIS

### I. Summary Judgment Standard

Federal Rule of Civil Procedure 56(c) requires the court to grant a motion for summary judgment if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to

---

[4]Upon the end of its relationship with the plaintiff, TPAP sent a report, signed by Harkreader, to the Tennessee Department of Health – Bureau of Investigations (BOI), providing the initial referral information concerning the plaintiff, including the allegations that the plaintiff was disoriented at work and told her co-workers that she felt drunk. (Docket No. 39 Ex. 5 at 95-98.) The plaintiff subsequently received a phone call from a BOI investigator, asking for her version of the events. In January 2011, plaintiff's counsel, Nanette Gould, apparently also contacted a BOI investigator in an attempt to clear the plaintiff's name with the BOI – an attempt that was, according to Gould, successful. (Docket No. 49 Ex. 2.) TPAP's Motion to Strike seeks to strike Gould's affidavit, which describes her conversations with the TPAP investigator. (Docket No. 59.) As made clear herein, the court need not reach the issue of the propriety of Gould's affidavit.

judgment as a matter of law." If a moving party shows that there is no genuine issue of material fact on the essential elements of the claim, then the burden shifts to the non-moving party to provide evidence beyond the pleadings "set[ting] forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "In evaluating the evidence, the court must draw all inferences in the light most favorable to the non-moving party." *Moldowan*, 578 F.3d at 374.

"'[T]he judge's function is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). But "the mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient," and the non-moving party's proof must be more than "merely colorable." *Anderson*, 477 U.S. at 249, 252. An issue of fact is "genuine" only if a reasonable jury could find for the non-moving party. *Moldowan*, 578 F.3d at 374 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

### A. ADA Claim

The plaintiff's ADA claim is premised on the notion that she was discriminated against because Centennial perceived her as a drug user. (Docket No. 46 Ex. 1 at 19; Docket No. 5 at 15-16.) There appears to be no basis for any federal claim in this case against TPAP, and no such claim is made in the Second Amended Complaint. (*Id.*)

In order to advance an ADA claim in this context, the plaintiff must establish, as a primary matter, that she is disabled. *See Bates v. Dura Automotive Sys.*, 625 F.3d 283, 285 (6th

Cir. 2011); *Penny v. United Parcel Serv.*, 128 F.3d 408, 414 (6th Cir. 1997). Under the ADA, an individual is disabled if she has "(1) a physical or mental impairment that substantially limits one or more major life activities; [or] (2) a record of such an impairment [or] (3) [been] regarded as having such an impairment." 42 U.S.C. § 12102(1). Again, the plaintiff's claim is premised on the "regarded as" prong – that is, Centennial regarded her drug use as a disability that substantially limited the major life activity of working. (Docket No. 46 Ex. 1 at 19.)

The plaintiff's argument in support of her ADA claim is brief and weak. (Docket No. 46 Ex. 1 at 19; Docket No. 48 at 7-10.) In support of her Motion for Summary Judgment, the plaintiff devotes about one page to the ADA claim. (Docket No. 46 Ex. 1 at 19.) After spending most of this page restating the legal standard for her claim, the plaintiff states that she is "similarly situated to the Plaintiff in *Parry v. Mohawk Motors of Michigan, Inc*" and that she was "erroneously regarded as a drug user by both Defendants," like the plaintiff in *Parry*. (*Id.*) The plaintiff concludes, "the facts and Defendants' actions constitute a prima facie case of disability discrimination against Plaintiff." (*Id.* at 19-20.) In response to Centennial's Motion for Summary Judgment on the ADA claim, the plaintiff, again, devotes considerable attention to the legal standard before launching into an extended and unfocused discussion of the"[un]reliable information" on which Centennial relied and the lack of "critical thinking" employed by Centennial in demanding her referral to TPAP. (Docket No. 48 at 6-10.)

The plaintiff's ADA claim is without merit. It is true that, in *Parry*, the court held that, where an employer erroneously believes that an employee has a drug addiction that substantially limits a major life activity, that employee can proceed with attempting to prove his *prima facie*

13

case under the "regarded as" disabled theory. 236 F.3d at 310-11.

However, here, as in *Parry*, there is no evidence that Centennial believed that the plaintiff had a drug addiction, let alone a drug addiction that substantially limited a major life activity. *See id.* (dismissing ADA claim for lack of evidence to support "regarded as" claim) Rather, as the plaintiff herself points out, until February 25, 2009, the plaintiff was regarded as a highly competent nurse with no apparent limitations on her ability to treat high risk patients. On February 25th, the plaintiff had a few hours in which she appeared to be "groggy" and confused and unable to assist patients. This led to a drug test that was *negative* and several months of hostility between the parties over whether the plaintiff would enroll in TPAP to confront whatever difficulties led to her problems on February 25th, before the plaintiff's employment was finally terminated. Simply put, any argument that the plaintiff was "regarded as" having a "disability," as that term is defined under the ADA, is entirely misplaced under the undisputed facts of this case.[5]

Further, aside from conclusory statements, the plaintiff provides no evidence that might be helpful in making out her *prima facie* ADA case, such as evidence that she suffered an adverse employment action because of her "disability." *See Tally v. Family Dollar Stores of Ohio, Inc.*, 542 F.3d 1099, 1107 (6th Cir. 2008). There is no evidence that either of Centennial's potentially "adverse" actions in this case (the referral to TPAP or the termination) were because

---

[5]It should also be noted that impairments and difficulties that are "transitory and minor," that is, with an actual or expected duration of six months or less, are not conditions that can qualify as "disabilities" for purposes of being "regarded as" disabled by one's employer. 42 U.S.C. § 12102(3)(B). The plaintiff's condition was clearly fleeting, providing additional basis to reject her ADA claim.

Centennial believed that the plaintiff was a drug user. Indeed, Centennial knew well before the referral that the drug screen was negative, and there is nothing in the record to suggest any other basis for the termination other than that the plaintiff did not get herself fully enrolled in the TPAP program quickly enough. This is simply not an ADA case, and the plaintiff's ADA claim will be dismissed.

> **B.** **Other Claims**

The sole basis for removal of this case from state court, where it had been proceeding for more than four months, was a weak ADA claim against one of the defendants. That claim will be dismissed, raising the question of whether the court should decline to exercise supplemental jurisdiction under Section 1367 over the remaining state law claims and remand this case back to the state court. See 28 U.S.C. § 1447(c); 28 U.S.C. § 1367(c); *Thurmond v. County of Wayne*, 2011 WL 2270901, *8 (6th Cir. June 10, 2011).

In determining whether to retain jurisdiction over state law claims, a district court should consider and weigh several factors, including the values of judicial economy, convenience, fairness and comity. *Gamel v. City of Cincinnati*, 625 F.3d 949, 951-52 (6th Cir. 2010). However, "when all federal claims are dismissed before trial, the balance of considerations usually will point to dismissing the state law claims, or remanding them to state court if the action was removed." *Id.* (internal citation and quotation omitted).

Here, the balance of considerations favor remand. This case has little business being in federal court; it is a dispute between Tennessee parties, including an association that exclusively represents Tennessee professionals, and, if it had been more carefully and reasonably pled, it

would have raised only Tennessee common law causes of action. Additionally, a review of the briefing shows that this case raises numerous issues of Tennessee state law, including issues of the scope of common law duty, the reach of the state worker's compensation law, and the Rules of Professional Responsibility, all of which are best handled by a Tennessee state court.

The court recognizes that the parties have done considerable discovery work and summary judgment briefing while this matter has been pending before this court. However, this work will not be for naught. On remand, the same discovery and briefing will be applicable to the claims pending before the state court. While there may be administrative delays in terms of getting this case to the "place" that it was before this court, these delays are somewhat balanced by the fact that there have been few delays in the federal court – indeed, the parties are getting their "answer" to the summary judgment motions less than two weeks after the last reply was filed and the motions became "ripe."

Setting aside the potential for a slight delay, the issue, as the court sees it, is whether a state court or a federal court should resolve the dispositive motions (and preside over a potential subsequent trial) in a case that now raises only state law causes of action, contains involved issues of purely state law, and involves parties that all reside in Tennessee. Framed in this light, remand is clearly appropriate.

## **CONCLUSION**

For the reasons discussed herein, the plaintiff's ADA claim will be dismissed, and this case will be remanded to the Davidson County Circuit Court.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge